T.C. Memo. 2000-338

UNITED STATES TAX COURT

ESTATE OF MARIE A. BIES, DECEASED, LARRY D. DUNN, PERSONAL
REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3159-99.                    Filed November 2, 2000.

<u>Raymond D. Rossini</u>, for petitioner.

<u>Jack M. Forsberg</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined a deficiency of $129,866

in the estate's Federal estate tax.

The sole issue for decision[1] is whether annual transfers of

_____

[1]In the notice of deficiency, respondent disallowed certain
funeral and administrative expenses and determined values for the
Mueller-Bies Funeral Home, Inc. stock and other property that
                                              (continued...)

closely held corporation stock made by Marie A. Bies (decedent) to two daughters-in-law during the years 1985 through 1995, and to a granddaughter-in-law during the years 1991 through 1995, were, in substance, indirect transfers of stock to decedent's sons and grandson. We hold they were.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Decedent died testate on July 9, 1995, in Roseville, Minnesota (Roseville). At the time the petition in this case was filed, the personal representative of the estate, Larry D. Dunn, resided in St. Paul, Minnesota (St. Paul).

The Bies Family

Decedent married Albert N. Bies (Albert Sr. or her husband; collectively, when referring to them both, the Bieses) in 1938 and remained married to him until his death on May 12, 1990. The Bieses had four children, Joanne, Albert, Barbara, and Gregory (collectively, the Bies children).

James C. Nielsen, Sr. (James Sr.), and Joanne married in

---

[1](...continued)
increased the value of the gross estate reported on the estate tax return. Petitioner assigned error to all these determinations.

The parties have agreed that any issues they are unable to settle will be tried later.

1963; Albert and Gayle Bies (Gayle) married in 1961; Richard Bloechl and Barbara married in 1971; and Gregory and Loretta Bies (Loretta) married in 1973. At the time of decedent's death, each Bies child was married. However, approximately 1 year after decedent's death, Gregory died unexpectedly.

At the time of her death, decedent had nine grandchildren, including James C. Nielsen, Jr. (James), the son of Joanne and James Sr. James and Cheryl L. Nielsen (Cheryl) married in 1990, and were married at the time of decedent's death.

The Family Business

Mueller-Bies Funeral Home was founded in 1906 by decedent's father, Charles Mueller. Decedent's father was succeeded in the business by decedent's husband, Albert Sr. In 1962, Albert Sr. incorporated the business as Mueller-Bies Funeral Home, Inc. (MBI). Decedent was a member of the MBI board of directors and treasurer of the corporation from 1985 until the year of her death.

At all times since its incorporation, MBI has had a single class of stock and 150 shares issued and outstanding. Albert Sr. owned 100 shares and decedent owned 50 shares until December 26, 1985; on that date, Albert Sr. transferred 25 shares to decedent.

Throughout the period from December 1, 1985, until the date of decedent's death, MBI operated funeral homes in St. Paul and Roseville. During this time, Albert, Gregory, and James were

licensed funeral directors, and all were employed by MBI in that capacity. Joanne and Loretta were employed by MBI as secretary/receptionists. None of decedent's other descendants was employed by MBI.

Decedent's Estate Plan and Transfers of MBI Stock

Richard A. Grayson (Mr. Grayson) is an attorney, consultant, and appraiser who specializes in mortuary matters. Mr. Grayson represented MBI from some time in the 1970's until decedent's death in 1995. Mr. Grayson also drafted the wills of decedent and her husband and advised them on estate planning matters.

As a result of consolidation of the funeral home business by national companies during the early 1980's, Mr. Grayson believed that the value of MBI had increased. Mr. Grayson advised the Bieses to begin making gifts of stock to family members to save estate taxes and to ensure family succession of the business. The Bieses were concerned that their children who were not committed to the funeral home business would sell the shares, and MBI would no longer be a family owned and operated business. Because neither Joanne nor Barbara was committed to the business, Albert Sr. and decedent did not intend and did not make gifts of MBI stock to either of them. Therefore, the Bieses intended initially to make gifts of MBI stock to only Albert and Gregory, who were both licensed funeral directors. However, upon Mr. Grayson's recommendation, the Bieses transferred shares to Gayle

and Loretta as well as to Albert and Gregory. Shares were transferred to Gayle even though she told the Bieses that she did not want to be in the funeral home business.

Beginning in 1985, and each year until her death, decedent transferred shares of MBI stock to Albert, Gayle, Gregory, and Loretta. Beginning in 1991, and each year until her death, decedent transferred shares of MBI stock to James and his wife Cheryl. Each transfer was to an individual, and each transfer was the number of shares or fraction of a share calculated by Mr. Grayson to be equal in value to $10,000.

The procedure was the same for each of the 27 transfers at issue: Mr. Grayson would prepare the certificates to transfer MBI shares to Albert, Gayle, Gregory, and Loretta, and at the same time, he would prepare the certificates for the shares transferred from Gayle to Albert, and from Loretta to Gregory. After Mr. Grayson had prepared all transfer documents, he would deliver them to the funeral home for endorsement. Albert, as president of MBI, endorsed all the certificates before delivery to the donees, including the shares that would be issued to Albert and Gregory once Gayle and Loretta endorsed the certificates for transfer. Gayle and Loretta transferred the shares received from decedent to their husbands upon receipt.[2]

---

[2]The stock transfers from Gayle and Loretta to Albert and Gregory, respectively, were dated the day after decedent's

(continued...)

Mr. Grayson would retrieve the documents after they were signed, and the transfers were then recorded in the corporate stock ledger. After their marriage, the transfers of shares from decedent to James and Cheryl, and from Cheryl to James, were made according to this same procedure.

Decedent did not file a Form 709, United States Gift Tax Return, with respect to any of these transfers, nor were any taxable gifts reported on Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return.

Decedent's Will

Decedent owned shares of MBI stock at the time of her death,[3] and her will, executed September 8, 1989, provided:

> SECOND. After the payment of such funeral expenses and debts, I hereby make the following specific devises:
>
> *    *    *    *    *    *    *
>
> B.    All capital stock in Mueller-Bies Funeral Home, Inc., to my sons, Albert W. Bies and Gregory J. Bies, or to the survivor of them;
> * * *

---

[2](...continued)
transfers to them. However, the record shows that the documents were prepared at the same time.

[3]The personal representative reported on the estate tax return that decedent owned 5.068 shares of MBI stock at the time of her death. Petitioner represented in the petition that decedent owned 5.9046 shares of MBI stock on the date of her death. The exact number of shares that decedent owned at her death is not now at issue.

The Donees' Buy/Sell Agreements

On January 10, 1986, Albert and Gregory, each in anticipation of acquiring "through gift and/or inheritance" 50 percent of the shares of MBI, entered into an agreement with MBI (the 1986 agreement), which provided in part that MBI would obtain insurance on each of their lives and upon the death of either shareholder, the estate of the deceased shareholder must sell and MBI must purchase all of the deceased shareholder's MBI shares.

The agreement also provided that in the event that at the time MBI was required to purchase the deceased shareholder's stock, MBI had insufficient surplus to fulfill its obligation, the entire available surplus could be used to purchase a portion of the deceased shareholder's MBI shares, and the remaining shareholder and MBI were required to take other action necessary for the redemption of the shares not purchased.

In 1991, Albert, Gregory, and James entered into an agreement with MBI (the 1991 agreement), identical in relevant part to the 1986 agreement, except that all three collectively anticipated they would become the "sole Stockholders" of MBI through gifts and/or inheritance and that MBI would obtain insurance on each of their lives.

Upon the death of Gregory in 1996, Loretta inherited the 69.25 shares of MBI stock that Gregory owned at the time of his

death.  At some time during September 1996, Albert and Loretta entered into an option contract, which provided in part that Albert agreed that Loretta may purchase sufficient shares of MBI from Albert to make Loretta and Albert equal shareholders if any of Loretta's children obtain a license to practice mortuary science within 6 years from the date of the agreement.  On or about December 31, 1996, MBI redeemed 41 shares from Loretta, and she retained 28.5 shares.

## OPINION

Respondent determined that decedent's transfers of MBI stock to Gayle, Loretta, and Cheryl were, in substance, indirect transfers of additional shares to Albert, Gregory, and James, respectively.  Respondent contends that decedent transferred the MBI stock through Gayle, Loretta, and Cheryl to Albert, Gregory, and James, respectively, for the purpose of obtaining additional annual gift tax exclusions.

Petitioner asserts that decedent's transfers of MBI stock to Gayle, Loretta, and Cheryl were, both in form and substance, transfers only to Gayle, Loretta, and Cheryl.

Respondent's determinations of fact are presumptively correct, and petitioner bears the burden of proving by a preponderance of the evidence that those determinations are

erroneous.  See Rule 142(a);[4] <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

Section 2001(a) provides that a tax is imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States.  The tax imposed is equal to the excess of a tentative tax computed on the sum of the taxable estate and the adjusted taxable gifts over the aggregate amount of tax that would have been payable with respect to gifts made by the decedent after December 31, 1976, using the unified rate schedule in effect at the date of death.  See sec. 2001(b).  The term "adjusted taxable gifts" means the total amount of the taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts which are includable in the gross estate.  See <u>id.</u>

In general, a tax is imposed for each calendar year on the transfer of property by gift by any individual, whether the gift is made directly or indirectly.  See secs. 2501(a), 2511(a).  The term "taxable gifts" means the total amount of gifts made during the calendar year, less certain deductions.  See sec. 2503(a).  However, the first $10,000 of gifts of a present interest in

---

[4]Rule references are to the Tax Court Rules of Practice and Procedure.  All section references are to the Internal Revenue Code in effect for the date of decedent's death, unless otherwise indicated.

property made by a donor to any person in a calendar year is excluded from taxable gifts. See sec. 2503(b).

As a general rule, we will respect the form of a transaction. We will not apply the substance over form principles unless the circumstances so warrant. See Gregory v. Helvering, 293 U.S. 465 (1935); Estate of Jalkut v. Commissioner, 96 T.C. 675, 686 (1991). Courts have applied the substance over form principles in gift tax cases to determine the real donee and value of the property transferred. See, e.g., Heyen v. United States, 945 F.2d 359, 363 (10th Cir. 1991); Estate of Cidulka v. Commissioner, T.C. Memo. 1996-149. In these cases, the indirect transfers of the property to the intended donees were the result of a prearranged plan. See, e.g., Heyen v. United States, supra at 361 (donor transferred stock to 29 straws who either did not know they were receiving stock or believed that they were participating in stock transfers or had agreed before receiving the stock to its retransfer, 27 of whom then retransferred the stock to the donor's intended donees); Estate of Cidulka v. Commissioner, supra (father's 14 transfers of stock to daughter-in-law, who, on the same day, transferred the stock to her husband, provided "inference" of an "understanding" between father and daughter-in-law that her shares would be merely a pass-through of shares to her husband).

Section 2511(a) requires consideration of whether decedent made indirect transfers. Accordingly, we must decide whether Gayle, Loretta, and Cheryl were merely intermediate recipients of decedent's indirect transfers of stock to Albert, Gregory, and James, respectively, or were the intended beneficiaries of decedent's bounty. See Heyen v. United States, supra at 362; Estate of Cidulka v. Commissioner, supra.

We consider the objective facts of the transfers and the circumstances under which they were made evidence of decedent's actual intent in making the stock transfers. See United States v. Estate of Grace, 395 U.S. 316, 323 (1969); Heyen v. United States, supra at 362-363; sec. 25.2511-1(g)(1), Gift Tax Regs. The evidence shows that the simultaneous transfers were all part of a prearranged single transaction.

It is clear that decedent arranged to give annually to each recipient the number of MBI shares that would avoid imposition of the gift tax. This fact, by itself, is not evidence of an ulterior purpose in making the stock transfers to Gayle, Loretta, and Cheryl. See Gregory v. Helvering, supra at 469 ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). However, it is also clear from the record that Gayle, Loretta, and Cheryl had preexisting agreements to transfer the shares to their husbands. Mr. Grayson

testified that he knew before decedent made the gifts that the wives had agreed to transfer the shares to their husbands. Moreover, decedent was treasurer of MBI and a member of its board of directors; therefore, it cannot be denied that she knew Gayle, Loretta, and Cheryl made immediate transfers of the shares to Albert, Gregory, and James, respectively.

Decedent executed her will in 1989. The will provided for the bequest of the MBI stock that decedent held at death to her sons, or to the survivor of them. Thus, in the event either of her sons had predeceased decedent, decedent did not intend for the surviving spouse of the deceased son to take any shares. This provision is evidence of decedent's intentions regarding ownership of MBI stock by her daughters-in-law.

Furthermore, decedent made no inter vivos or testamentary transfers of MBI stock to either Joanne or Barbara, because neither daughter was committed to the funeral home business. However, decedent made transfers of stock to Gayle even though she knew that Gayle did not want to be in the funeral home business. This is strong evidence that the stock transfers to the daughters-in-law actually were indirect transfers to her sons.

The 1986 and 1991 agreements show that Albert, Gregory, and James anticipated owning collectively all the MBI shares. Mr. Grayson, Albert, Loretta, Gayle, James, and Cheryl testified that

the shares in the closely held corporation were transferred to the husbands so that in the event Albert, Gregory, or James predeceased his wife, MBI would purchase the shares and provide the surviving spouse liquidity. This testimony is not supported by the facts.

Upon the death of Gregory, MBI did not redeem all his shares. Rather, Loretta inherited the shares, and none of those shares was sold to MBI until after Loretta reached a conditional agreement with Albert for the purchase of enough of his shares to equalize their ownership interests. Although Loretta testified that the MBI shares "had absolutely no value" to her, it is evident from Loretta's retention of almost twice the amount of shares initially transferred through her by decedent, and by Loretta's agreement with Albert for the purchase of more shares, that, contrary to her testimony, Loretta preferred owning MBI stock to cash. The objective evidence does not support the purported reason for the stock transfers between the spouses.

Viewed as a whole, the evidence shows the daughters-in-law were merely intermediate recipients, and that decedent intended to transfer the stock to her lineal descendants who were committed to continuing the operation of the funeral home business.

We conclude that the inter vivos transfers of the MBI shares to Gayle, Loretta, and Cheryl were, in fact, indirect transfers of additional shares to decedent's sons and grandson.

Accordingly, to reflect the foregoing,

<u>An appropriate order will be issued</u>.